**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | : | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| GAIL MORRIS<br><br>Plaintiff,<br><br>vs.<br><br>NOVO NORDISK INC., AND NOVO NORDISK A/S<br><br>Defendants. | : | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO. 2:26-cv-07943 |

## COMPLAINT AND JURY DEMAND

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Southern District of Texas as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X Plaintiff currently resides in Kemah, Texas (City/State).

X Plaintiff purchased and used Defendant(s)' products in Kemah, Texas (City/State).

__ The Original Venue is a judicial district in which Defendant __________ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): Defendants routinely market their product at issue in this District and conduct business in this District related to their product at issue in the State of Texas. Venue is further proper as Plaintiff is a resident of Texas, was prescribed all Defendant's product in the state of Texas, and it where her injury and subsequent treatment occurred.

X There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendants Novo Nordisk Inc., and Novo Nordisk A/S is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): ________________________________________

COMES NOW, Plaintiff, Gail Morris, by and through the undersigned counsel, and brings their complaint against Defendant Novo Nordisk Inc. for damages suffered by Gail Morris who was severely injured as a result of Defendant's widespread marketing of their drugs, Ozempic, and her subsequent use of Ozempic, and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. At all relevant times hereto, Plaintiff Gail Morris was a resident and citizen of the state of Texas.

2. Plaintiff was prescribed Ozempic and took the medications as directed by her physicians. As a result of her use of Ozempic, she developed non-arteritic anterior ischemic optic

neuropathy (NAION) in both eyes and suffers severe physical and emotional injuries and radical changes to her lifestyle given her severe loss of sight.

3. Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

4. Defendant Novo Nordisk Inc. is wholly owned by Novo Nordisk US Commercial Holdings, Inc.

5. Upon information and belief, Defendant failed to warn physicians and the end users of Ozempic of the complications and devastating effects of which the company knew or should have known, including NAION, which can result in blindness and permanent vision loss.

6. Upon information and belief, Defendant's marketing was deceptive and misleading about the true risks associated with use of Ozempic of which the company knew or should have known.

## <u>BACKGROUND</u>

### I. The Development and Approval of Ozempic

7. In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist—the drug caused the rats to stop eating almost entirely.[1]

8. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 24, 2026).
[2] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Sept. 24, 2026).

and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

9. To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

10. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

11. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[6]

12. Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity.[7]

13. Years later, in 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza,[8] at which point Novo Nordisk moved forward with studying the drug for weight loss.[9]

---

[3] *Id.*
[4] *Id.*
[5] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 24, 2026).
[6] *Id.*
[7] *Id.*
[8] Jackson, S. H., Martin, T. S., Jones, J. D., Seal, D., & Emanuel, F. (2010). Liraglutide (victoza): the first once-daily incretin mimetic injection for type-2 diabetes. *P & T: a peer-reviewed journal for formulary management*, 35(9), 498–529. https://pmc.ncbi.nlm.nih.gov/articles/PMC2957743/ (last visited Aug. 27, 2025).
[9] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 24, 2026).

14. After clinical trials, in 2014 the FDA approved liraglutide for treatment of obesity under Novo Nordisk's brand name Saxenda as a daily injectable.[10]

15. Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their weight.[11]

16. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[12]

17. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016, announced submission of Ozempic's New Drug Application (NDA) to the FDA for regulatory approval of once-weekly injectable in 0.5 mg or 1 mg for treatment of type 2 diabetes. The announcement stated "once-weekly" Ozempic had a safe and well-tolerated profile, and that the most common adverse event was nausea.[13]

18. On December 5, 2017, the FDA approved the application and granted premarket approval as NDA 209637 to Defendant Novo Nordisk Inc.

19. Defendant continues to be the holder of the NDA and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label.

20. Defendant had completed the clinical trial studying semaglutide for weight loss, and its results were published February 10, 2021.[14]

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited Sept. 24, 2026).
[14] Wilding John P.H., Batterham Rachel L., Calanna Salvatore, et al. Once-weekly semaglutide in

21. In addition to the results, the published study, which was funded by Defendant, argued: "Obesity is a chronic disease and global public health challenge."[15]

22. On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental a new drug application for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[16] On January 16, 2020, the FDA approved their new indication.

23. Then, on May 28, 2021, Defendant Novo Nordisk Inc. submitted another sNDA requesting approval for a higher 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved their request.

24. In their press release, Defendant represented Ozempic as having "proven safety and efficacy," and they continued to advertise that "it can help many patients lose some weight."[17] As with its prior press releases, Defendant disclosed Important Safety Information and provided a link to the Medication Guide and Prescribing Information. However, NAION and permanent vision loss were not identified as risks.

## II. Marketing and Promotion Create a Media Frenzy and Mega Seller

25. Since Defendant discovered GLP-1 agonists potential use for weight loss, Defendant began working to change medical consensus as it relates to obesity.

---

adults with overweight or obesity. *New England Journal of Medicine*. 2021;384(11):989-1002. doi:10.1056/NEJMoa2032183

[15] *Id*.

[16] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited Sept. 24, 2026).

[17] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited Sept. 24, 2026).

26. Throughout their marketing, Defendant fails to disclose the true serious side effects of Ozempic, such as permanent vision loss.

27. When the Defendant announced that they had started selling Ozempic in the United States, they touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" The Defendant offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."18

28. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[19] but Novo Nordisk had already begun mentioning weight loss in their Ozempic commercials.[20]

29. On July 30, 2018, the Defendant launched its first television ad for Ozempic with the catchy jingle to the tune of the 1970s hit pop song "Magic" by Pilot, wherein the Defendant advertised that "adults lost on average up to 12 pounds" when taking Ozempic.[21]

30. Over the next five years, the Defendant spent 884,000,000 million dollars on running television ads in the United States to promote Ozempic, Wegovy, and another of its lesser-known GLP-1 agonists, Rybelsus, with most advertisements allocated towards Ozempic.[22]

31. Defendant's aggressive marketing includes several different platforms, including over 4,000 marketing advertisements for Ozempic and similar weight-loss medications that have

---

[18] *See* Novo Nordisk, *Novo Nordisk Launches Ozempic and Fiasp, Expanding Treatment Options for Adults With Diabetes*, PR NEWSWIRE (Feb. 5, 2018), https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiaspexpanding-treatment-options-for-adults-with-diabetes-300592808.html.

[19] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 24, 2026).

[20] *Id.*

[21] https://www.ispot.tv/ad/d6Xz/ozempic-oh (last visited Sept. 24, 2026).

[22] https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited Sept. 24, 2026).

been placed on Facebook and Instagram.[23]

32. As a result of their heavy focus on direct-to-consumer advertising, many patients specifically sought out prescriptions for Ozempic.

33. According to open payments data, Novo Nordisk spent $33,927,336.42 on marketing/consulting/travel/food and beverage/etc. to physicians in 2022 alone.[24]

34. Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns.

35. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[25]

36. Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic in 2022.[26]

37. Ozempic ranked as the sixth most-advertised prescription drug brand in 2022, with a U.S. measured-media spend of $181 million, according to Vivvix spending data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[27]

38. In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic and Wegovy.[28]

---

[23] https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (last visited Sept. 24, 2026).
[24] *https*://openpaymentsdata.cms.gov/company/100000000144 (last visited Sept. 24, 2026).
[25] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on Sept. 24, 2026).
[26] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Sept. 24, 2026).
[27] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571?utm_source=exchange&utm_medium=email&utm_campaign=t5687390 (last visited Sept. 24, 2026).
[28] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/ (last visited Sept. 24, 2026)

39. Defendant also owns and operates several marketing campaign websites that are created for the purpose of educating on the science of obesity and creating a change in how obesity is understood and treated.

40. Ther includes the website "The Truth about Weight."[29]

41. Defendant has also spent significant resources aligning themselves and infiltrating their influence into physician and advocacy groups.

42. Ther includes the American Board of Obesity Medicine. The former Director of the American Board of Obesity Medicine who served from 2017 to November of 2021 received payments by Novo Nordisk during her time as director of the American Board of Obesity Medicine.[30]

43. Ther former director of the American Board of Obesity Medicine currently promotes their GLP-1 agonists for weight loss as part of their telehealth company and continues to receive payments.[31]

44. At least one member of the American Board of Obesity Medicine that helped write the guidelines for obesity management has received payments directly from Novo Nordisk according to Open Payments Data during the same time he wrote those guidelines.[32]

45. Novo Nordisk contributes money directly to education courses used to satisfy

---

[29] Truth About Weight, https://www.truthaboutweight.com/ (last visited on Sept. 24, 2026).
[30] https://joinfound.com/pages/medication-biology (last visited on Sept. 24, 2026); https://openpaymentsdata.cms.gov/physician/1294300 (last visited Sept. 24, 2026); https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited on Sept. 24, 2026).
[31] https://joinfound.com/pages/medication-biology (last visited on Sept. 24, 2026);https://openpaymentsdata.cms.gov/physician/1294300 (last visited on Sept. 24, 2026); https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited on Sept. 24, 2026).
[32] https://openpaymentsdata.cms.gov/physician/1379381 (last visited Sept. 24, 2026); *see also* https://www.abom.org/karl-nadolsky/.

continuing education requirements or to prepare for certification in obesity medicine.[33]

46. Novo Nordisk serves on the board and/or provides direct financial contributions to many public health advocacy groups.

47. Ther includes Obesity in Action Coalition, to which Novo Nordisk contributes more than $500,000 annually.[34] Novo Nordisk has been a partner since 2013, before any of its drugs were approved for weight loss.

48. Novo Nordisk also serves on the Corporate Council of American Society for Metabolic and Bariatric Society, another public health partner of the American Board of Obesity Medicine.[35]

49. Novo Nordisk is also a corporate member and directly financially contributes to Stop Obesity Alliance, yet another public health partner of the American Board of Obesity Medicine.[36]

50. Novo Nordisk is a member of additional advocacy organizations and lobbying groups separate and apart from these public health partners of the American Board of Obesity Medicine.

51. Ther includes the Obesity Care Advocacy Network, which lobbies for legislation to expand access to Novo Nordisk's drugs.[37]

52. Defendant has deceptively promoted their weight loss drugs on television and news segments.

---

[33] *Id.*
[34] https://www.obesityaction.org/corporate-partners/ (last accessed Sept. 24, 2026).
[35] https://asmbs.org/corporate-council (last visited Sept. 24, 2026).
[36] https://stop.publichealth.gwu.edu/membership (last visited on Sept. 24, 2026).
[37]https://assets.obesitycareadvocacynetwork.com/TROA_fact_sheet_11_12_21_48098432e0/TROA_fact_sheet_11_12_21_48098432e0.pdf (last visited on Sept. 24, 2026)

53. For example, Novo Nordisk's drugs were the subject of an investigative report on 60 Minutes that aired New Year's Day of 2023.[38]

54. Complaints have been filed alleging that the "news" piece was in reality "deceptive marketing" in which all physicians interviewed had received payments by Novo Nordisk. [39]

55. The financial relationship between Novo Nordisk and the physicians speaking about Ozempic was not explicitly disclosed.[40] The reporter stated that the physicians had *advised* Novo Nordisk but failed to state they had been compensated by the company.[41]

56. The FDA is currently investigating the marketing practices of Novo Nordisk.[42]

57. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

58. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data. [43]

59. Defendant has directly and indirectly partnered with telehealth providers to promote their weight loss drugs.

60. This includes a 2019 direct partnership between Novo Nordisk and Noom, a leading behavior weight loss company.[44]

---

[38] https://www.cbsnews.com/news/wegozy-ozempic-explainer-60-minutes-2023-01-01/ (last visited Sept. 24, 2026).
[39] https://www.fiercepharma.com/marketing/health-group-lambasts-novo-nordisk-60-minutes-paid-news-program-weight-loss-med-wegovy (last visited Sept. 24, 2026).
[40] https://fair.org/home/60-minutes-weight-loss-tip-dont-bite-the-hand-that-feeds-you/ (last visited on Sept. 24, 2026).
[41] *Id.*
[42] https://www.pcrm.org/news/news-releases/fda-confirms-investigation-novo-nordisk-ad-posited-60-minutes-story-about-weight (last visited Sept. 24, 2026)
[43] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Sept. 24, 2026)
[44] https://www.prnewswire.com/in/news-releases/novo-nordisk-and-noom-to-partner-around-digital-health-solutions-to-help-people-with-obesity-lose-weight-and-keep-it-off-811725389.html (last visited on Sept. 24, 2026).

61. In 2021, Novo Holdings participated in a $540 million round of financing with Noom.[45] At that time, Novo Holdings tweeted that it "is pleased to note that it has participated in the $540 million Series F round in @noom, a leading digital health platform…".[46]

62. Novo Holdings has or has had "venture investments" in Noom.

63. Noom Med now provides to consumers, using physicians hired by Noom, prescriptions for weight loss directly to patients.[47]

64. Noom Med promotes off label usage of these weight loss drugs on its website.[48]

65. Noom currently has over 45 million users.[49]

66. Other telehealth providers have jumped on board the bandwagon in offering prescriptions directly to consumers for Defendant's weight-loss medications.

67. This includes Weight Watchers, who purchased telehealth startup Sequence for $132,000,000 in order to provide weight loss medications to its subscribers.[50]

68. There are currently millions of Weight Watchers subscribers.

69. It also includes Calibrate, yet another telehealth provider for weight loss medications, which raised $100 million in capital funding from investors in 2021.

---

[45] https://www.businesswire.com/news/home/20210525005492/en/Noom-Announces-540-Million-in-Growth-Funding-to-Further-Accelerate-Expansion-of-its-Digital-Health-Platform (last visited Sept. 24, 2026).

[46] https://twitter.com/novoholdings/status/1397170264702599171(last visited Sept. 24, 2026)

[47] https://abcnews.go.com/GMA/Wellness/noom-joins-weight-watchers-offering-medications-wegovy-weight/story?id=99841160 (last visited on Sept. 24, 2026).

[48] https://www.noom.com/med/ (last visited on Sept. 24, 2026).

[49] https://exitsandoutcomes.com/free-excerpt-from-the-noom-report-a-45-million-moat/ (Sept. 24, 2026).

[50] https://www.usatoday.com/story/news/health/2023/03/07/weightwatchers-sequence-wegovy-obesity-weight-loss-drugs/11415201002/ (last visited on Sept. 24, 2026).

70. Collectively, the telehealth providers that Novo Nordisk directly and indirectly partners with and/or promotes account for approximately half of all weight loss prescriptions in 2022.

71. In sum, Defendant promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

72. Novo Nordisk's comprehensive, immersive marketing has left no stone unturned in delivering their message that physicians and patients must use their drugs to treat obesity.

### III. Marketing Works: Defendant's Rampant Promotion Result in Thousands of Prescriptions and Billions in Sales

73. As a result of Defendant's all-encompassing advertising and promotion efforts, Ozempic is widely prescribed throughout the United States.

74. In July of 2021, doctors in the US wrote 62,000 prescriptions a week for Ozempic.[51]

75. It has been reported that the huge demand created by extensive marketing has led to rampant off-label usage and "gaming" the system to allow for insurance coverage.[52]

76. The number of Ozempic prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.[53]

77. In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[54]

---

[51] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited on Sept. 24, 2026)

[52] *Id.*

[53] https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktok-telehealth/ (last visited on Sept. 24, 2026).

[54] https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited on Sept. 24, 2026).

78. As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% in the U.S. to more than $3.7 billion.[55]

**IV. Use of Ozempic has been linked to the development of NAION**

79. The Defendant knew or should have known of the risk of NAION with use of Ozempic.

80. Defendant conducts clinical trials and has access to case reports and medical literature that provides them with superior knowledge compared to the general public as to the potential risks of their medications.

81. For example, in a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People with Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[56]

82. The event occurred within the Semaglutide 2.0 mg dosage group which included 479 participants which is significant given the low background incidence of NAION.[57]

83. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

84. It falls within the category of an eye stroke.

---

[55] https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html#:~:text=Novo%20traded%20earnings%20jabs%20with,to%20more%20than%20%243.7%20billion. (last visited Sept. 24, 2026).

[56] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232.

[57] *Id.*

85. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

86. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. Ther swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[58]

87. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.[59]

88. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.[60]

89. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.[61]

90. Unfortunately, there is no effective treatment for NAION. Vision may worsen in the four weeks following the event. Some patients may see modest improvement in their vision, but complete recovery of vision is unusual.[62]

---

[58] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022, https://www.aao.org/eyenet/article/naion-diagnosis-and-management.

[59] Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION). American Academy of Ophthalmology, EyeWiki. https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION).

[60] *Id.*

[61] *Id.*

[62] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022, https://www.aao.org/eyenet/article/naion-diagnosis-and-management.

91. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

92. Some NAION patients lose complete vision with no recovery in affected eye(s).

93. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blinded in one eye and certainly both eyes result in bumps and falls and injuries related to the unseen impacts and accidents.

94. GLP-1 receptors have been detected in neuronal cells in the human eye.[63]

95. Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

96. The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide" authored by Hathaway *et al.* involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D) and 979 were overweight or obese.[64]

---

[63] Hebsgaard JB, Pyke C, Yildirim E, Knudsen LB, Heegaard S, Kvist PH. Glucagon-like peptide-1 receptor expression in the human eye. *Diabetes Obes Metab*. 2018; 20(9): 2304-2308. doi:10.1111/dom.13339.

[64] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296

97. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[65]

98. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[66]

99. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[67]

100. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[68]

101. The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D

---

[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*

and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[69]

102. Acknowledging the pathogenesis or cause of NAION remains unknown, the authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[70]

103. A metanalysis of all clinical trials of GLP-1 receptor drugs, including Novo's own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[71] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading a lower estimated risk.[72] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[73]

104. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[74]

---

[69] *Id.*
[70] *Id.*
[71] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomized controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076
[72] *Id.*
[73] *Id.*
[74] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online on December 11, 2024. doi:10.1101/2024.12.09.24318574

105. Ther cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication.[75] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[76]

106. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023,[77] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[78]

107. "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[79]

108. The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[80]

109. Interestingly, the study also observed that "after the introduction of once weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[81]

---

[75] *Id.*
[76] *Id.*
[77] Grauslund J, Taha AA, Molander LD, et al. Once weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*

110. Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION and that the PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[82]

111. In response, Novo Nordisk has acknowledged confirmed cases of NAION were identified within their clinical trials.[83]

112. A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated with the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[84]

113. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[85]

114. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later, after which she then experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

[82] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/ (last visited Sept. 24, 2026)
[83] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Sept. 24, 2026).
[84] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[85] *Id.*

115. Despite the growing number of articles, reports and an investigation by the PRAC of the Danish Medicines Agency, the Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic.

**V. Defendant's Continuing Failure to Disclose the Risk of NAION**

116. According to the Drugs@FDA website, the label for Ozempic has been updated on at least thirteen (13) occasions since 2017, with the most recent update on January 28, 2025.[86] Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

117. To date, the warning labels are still devoid of any mention of NAION.

118. Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic, monitoring of patients while on the medication, and advising patients to cease use of the medication if they develop symptoms consistent with NAION or after the fact as to not risk the potential for injury in the other eye.

119. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

120. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic's labels without any prior FDA approval.

---

[86] *See* Drugs@FDA: FDA-Approved Drugs, Ozempic, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (last visited Sept. 24, 2026).

121. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

122. Recently, the Third Circuit reaffirmed that plain text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case, Merck, could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal (FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. *See generally In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Case No. 22-3412, D.I. 82 at 73 on the docket (J. Jordan) (3d Cir. Sept. 20, 2024) (noting "the availability of a label change via a CBE supplement is problematic for Merck, as will very often be the case for pharmaceutical companies raising an impossibility defense").

**<u>PLAINTIFF-SPECIFIC FACTS</u>**

123. In or around May 2024, Plaintiff was prescribed Ozempic to treat her diabetes.

124. In or around November 2024, Plaintiff noticed changes in vision. After consulting with her primary care physician, she was referred to an ophthalmologist.

125. Plaintiff's ophthalmologist examined her with bilateral optic nerve swelling and a left rAPD and was instructed to stop Ozempic.

126. In or around January 2025, Plaintiff consulted her neuro-ophthalmologist where her physician documented that the highest entity of suspicion is a bilateral sequential anterior ischemic

optic neuropathy in the setting of GLP-1 agonist (Ozempic) use in which there is a 2-3-fold increased incidence of ischemic optic neuropathy.

127. In August 2025, Plaintiff was diagnosed with NAION by her neuro-ophthalmologist. In October 2025, Plaintiff followed up with her neuro-ophthalmologist where Plaintiff's NAION diagnosis was reaffirmed.

128. Had Plaintiff been told her use of Ozempic could cause her to develop NAION, she would have discontinued the medication right away. Instead, the package insert did not warn the medical community or patients of the risk of NAION.

129. A study linking GLP-1 receptor agonists (GLP-1 RAs), specifically semaglutide, to an increased risk of NAION was published online by *JAMA Ophthalmology* on July 3, 2024.

130. As a result of Defendant's actions and inactions, Plaintiff suffers from severe vision loss and seeks damages associated with these injuries.

131. Defendant knew or should have known that use of semaglutide, Ozempic, could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

132. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

133. Defendant's Ozempic was at all times utilized and prescribed in a manner foreseeable to Defendant.

134. Plaintiff used Ozempic, and did not misuse, or alter Ozempic in an unforeseeable manner.

135. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and her physicians the true and significant risks associated with these medications.

136. As a result of Defendant's actions, Plaintiff and her physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in their Complaint and that those risks were the direct and proximate result of Defendant's conduct.

137. As a direct result of being prescribed and using Ozempic, Plaintiff has been permanently and severely injured, having suffered serious consequences.

138. Plaintiff has and continues to suffer from Dry Eye Syndrome, Nausea, Anxiety, and has had to implement radical changes to her lifestyle given her severe loss of sight.

139. As a direct and proximate result of her Ozempic use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Ozempic was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

## COUNT I
## STRICT LIABILITY – FAILURE TO WARN

140. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

141. At all relevant times, Defendant engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

142. The Ozempic was expected to and did reach the usual consumers, handlers, and people coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

143. Defendant as the holder of the NDAs is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

144. Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Ozempic was inadequate.

145. The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendant knew or should have known of the risks of serious side effects including NAION, as well as other severe and permanent health consequences from Ozempic, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Ozempic.

146. Plaintiff did not have the same knowledge as Defendant and no adequate warning or other clinically relevant information, and data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

147. Defendant had a duty to provide adequate warnings and instructions for Ozempic, to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

148. Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Ozempic, as it became or could have become available to Defendant.

149. Defendant breached their duty when they failed to provide an adequate warning of Ozempic’s potential risk to Plaintiff.

150. Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drugs, Ozempic, to health care providers empowered to prescribe and dispense Ozempic to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of these medications, which resulted in permanent injuries to Plaintiff.

151. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

152. Despite the fact that Defendant knew or should have known that Ozempic caused unreasonable and dangerous side effects, they continue to promote and market Ozempic without providing adequate clinically relevant information.

153. Defendant knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendant’s failures.

154. The Ozempic supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant

possessed knowledge and information confirming the defective and unreasonably dangerous nature of Ozempic but despite their knowledge and information, Defendant failed and neglected to issue adequate warnings that Ozempic causes serious and potentially irreversible vision issues, optic nerve damage and NAION. Defendant has yet to issue any warnings or recommendations that patients taking Ozempic undergo ophthalmological monitoring.

155. Defendant's failure to provide adequate warnings or instructions rendered Ozempic unreasonably dangerous in that they failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

156. Defendant continues to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

157. Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Ozempic including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

158. Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

159. Defendant continued to aggressively promote and sell Ozempic, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

160. Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks

associated with exposure to Ozempic and/or that there existed safer and/or equally effective alternative drug products that do not pose their same risk.

161. By failing to adequately test and research harms associated with Ozempic and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Ozempic and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Ozempic. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Ozempic and should or could be reported as an adverse event.

162. The semaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Ozempic, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote. This harm could have been prevented had Plaintiff been properly warned.

163. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

164. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Ozempic could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendant provided reasonable instructions or warnings of these foreseeable risks of harm.

165. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT II**
**NEGLIGENCE**

166. Plaintiff incorporate by reference all the forgoing language of their Complaint as if fully set forth herein and further states as follows.

167. Defendant had a duty to exercise reasonable care in the designing, developing, researching, testing, and manufacturing, selling, and distribution of Ozempic.

168. Defendant knew or should have known that using Ozempic created a significantly increased risk of NAION.

169. The negligence of the Defendant, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a. Defendant designed and developed Ozempic without thoroughly or adequately testing it;

b. Defendant failed to adequately and correctly warn the Plaintiff, the public, and the medical community, of the NAION risks associated with Ozempic;

c. Defendant advertised and recommended the use of Ozempic for weight loss and diabetes without sufficient knowledge as to the significance of NAION risks;

d. Defendant failed to exercise reasonable care in designing Ozempic in a manner which was dangerous to its users;

e. Negligently representing that Ozempic had equivalent safety and efficacy as other forms of treatment for chronic weight management;

f. Defendant failed to exercise reasonable care when they collectively decided to conceal information concerning NAION risks;

170. Additionally, Defendant under-reported, underestimated and downplayed the serious dangers of Ozempic association with NAION.

171. Defendant specifically failed to exercise reasonable care and breached their duty to Plaintiff when it failed to accompany Ozempic with proper and/or accurate warnings regarding all adverse side effects—namely NAION—associated with the use of Ozempic.

172. Despite the fact that Defendant knew or should have known that Ozempic caused unreasonably dangerous side effects, like NAION, they made conscious decisions to downplay or ignore these risks and continue to market, manufacture, distribute, and/or sell Ozempic to consumers without adequate warnings, including the Plaintiff.

173. Defendant knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

174. Defendants' negligence was the proximate cause of Plaintiff's NAION-related injuries, which Plaintiff suffered and/or will continue to suffer.

175. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects such as NAION, as well as other related severe and personal injuries which are permanent and lasting in nature, mental anguish, including diminished enjoyment of life, as well as the need for continued medical treatment and monitoring.

176. As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

WHEREFORE, Plaintiff demands judgment against Defendant, and requests compensatory and punitive damages, together with costs and interests, and any further relief as the Court deems proper.

**COUNT III**
**BREACH OF IMPLIED WARRANTY**

177. Plaintiff incorporates by reference all the foregoing language of their Complaint as if fully set forth herein and further states as follows.

178. Defendant distributed, recommended, merchandized, advertised, promoted, and sold Ozempic as treatment for Diabetes and chronic weight management.

179. At the time Defendant marketed, sold, and distributed Ozempic for use by Plaintiff, Defendant knew of the use for which Ozempic were intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

180. Plaintiff and Plaintiff's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendant and used Ozempic for its intended advertised use.

181. Plaintiff used Ozempic for their intended purpose of treating her Diabetes.

182. Ozempic was not fit for their ordinary use of weight loss and treatment of Diabetes because they were defective due to them causing an increased risk of NAION.

183. As a direct cause of Ozempic being not fit for their ordinary purpose of treating Plaintiff's Diabetes due to their association with NAION, Plaintiff was diagnosed with NAION after taking Ozempic.

184. Within reasonable time after Plaintiff became aware that Ozempic were associated with NAION, Defendant was provided notice of the breach.

185. Defendant herein breached the aforesaid implied warranties, as their drug Ozempic were not fit for their intended purposes and uses.

WHEREFORE, Plaintiff demands judgment against Defendant, and requests compensatory damages, together with costs and interest, and any further relief as the Court deems proper.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

186. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

187. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed them into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

188. Defendant as the holder of NDA is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

189. Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Ozempic was safe, effective, fit and proper for their intended use.

190. Ozempic materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Ozempic, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic sold to Plaintiff.

191. Defendant expressly warranted that Ozempic was safe and well-tolerated. However, Defendant did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was particularly dangerous to the well-being of Plaintiff and Plaintiff’s vision.

192. Ozempic does not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

193. Plaintiff and Plaintiff's physicians justifiably relied on Defendant’s representations regarding the safety of Ozempic, and Defendant’s representations became part of the basis of the bargain.

194. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant’s representations that Ozempic was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

195. Plaintiff’s healthcare providers justifiably relied on Defendant’s representations

through Defendant's marketing and sales representatives in deciding to prescribe Ozempic over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

196. Plaintiff purchased and used Ozempic without knowing that the drug is not safe and well-tolerated, but that Ozempic instead causes significant and irreparable vision loss and eye damage.

197. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT V**
**EXEMPLARY (PUNITIVE) DAMAGES**

198. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

199. The acts and omissions of Defendant described herein consisted of gross negligence and/or malice and were done with an extreme degree of risk of advance knowledge, conscious disregard of the safety of others, intent to cause substantial injury, and/or ratification by Defendant's officers, directors, and/or managing agents.

200. Defendants' actions amounted to actual malice or gross negligence to the likelihood

of harm associated with their acts and omissions.

201. Defendant misled both the medical community and the public, including Plaintiff and her physicians, by making false representations about the safety and effectiveness of Ozempic and by failing to provide adequate instructions concerning its use.

202. Defendant downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Ozempic despite available information demonstrating that drug could cause NAION and irreversible vision loss.

203. Defendant was or should have been in possession of evidence demonstrating that Ozempic use could cause NAION and irreversible vision loss. Nevertheless, Defendant continues to market Ozempic by providing false and misleading information regarding its safety and effectiveness.

204. Defendant failed to provide warnings that would have dissuaded health care professionals from using Ozempic, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Ozempic.

205. As a proximate result of Defendant's acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to her use of Ozempic.

206. As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

207. Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

208. Defendant's actions were performed willfully, intentionally, and with reckless

disregard for the rights of Plaintiff and the public.

209. Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendant.

210. Defendant's conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

211. Consequently, Defendant is liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendant as follows:

a. Awarding compensatory damages;

b. Awarding actual damages to the Plaintiff incidental to Plaintiff purchase and use of Ozempic in an amount to be determined at trial;

c. Awarding punitive damages to the Plaintiff;

d. Awarding pre-judgment and post-judgment interest to the Plaintiff;

e. Awarding the costs and the expenses of their litigation to the Plaintiff;

f. Awarding reasonable attorneys' fees and costs to Plaintiff as provided by law; and

g. Granting all such other relief as the Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues.

RESPECTFULLY SUBMITTED

Ryan J. Duplechin
Wesley Chadwick Cook
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
P: 334.269.2343
Fax: 334.954.7555
Ryan.Duplechin@BeasleyAllen.com
Chad.Cook@BeasleyAllen.com

Date: October 16, 2026